# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

✓ FILED ___ ENTERED
____ LOGGED _____ RECEIVED

**12:40 pm, Oct 27 2025**

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DG _____ Deputy

IN THE MATTER OF THE
APPLICATION OF THE UNITED
STATES OF AMERICA FOR SEARCH
AND SEIZURE WARRANTS FOR
TWO CELLULAR DEVICES
CURRENTLY IN THE CUSTODY OF
BALTIMORE POLICE DEPARTMENT
AND THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES

Case No. 25-mj-02440

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Special Agent Jazmine Wright, Bureau of Alcohol, Tobacco, Firearms and Explosives

(ATF), being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    Pursuant to Federal Rule of Criminal Procedure 41, I make this affidavit in support

of an application for search and seizure warrants for Cellular Devices identified below (hereinafter

collectively referred to as "**TARGET CELLULAR DEVICES**"):

      a.    Apple iPhone ("**TARGET CELLULAR DEVICE 1**")[1] believed to belong
to Rico PERKINS ("PERKINS"), located in a vehicle registered to
PERKINS, parked outside his residence of 1512 Presstman St, Baltimore
MD, further identified in Attachment A, for items identified in Attachment

---

[1] The cellphone has been in law enforcement custody since PERKINS arrest on April 16, 2025. On April 23, 2025, Baltimore Police Department's homicide investigators executed a state search and seizure warrant on **TARGET CELLULAR DEVICE 1** in relation to a Baltimore City Homicide occurring on February 15, 2025, later described in this affidavit—however the state warrant is limited in scope. Federal investigators aim to obtain a full extraction of the device in support of this affidavit. The device is currently with Baltimore Police Department Digital Forensic Unit, where they are continuing to attempt to defeat the device's password protections and gain access. To my knowledge, no one has requested that **TARGET CELLULAR DEVICE 1** be returned. I further understand that PERKINS cannot access the phone while incarcerated because it is generally illegal in Maryland to possess contraband while in pretrial detention. Telecommunication devices, like cellphones, are considered contraband.

1

B.  Also, since April 16, 2025, **TARGET CELLULAR DEVICE 1** has been in the custody of the Baltimore Police Department (BPD).

b.  Apple iPhone ("**TARGET CELLULAR DEVICE 2**") believed to belong to Duane ROBERTS ("ROBERTS") located on his person, outside his residence of 1512 Presstman St, Baltimore MD, further identified in Attachment A, for items identified in Attachment B. On August 5, 2025 **TARGET CELLULAR DEVICE 2** was transferred to the custody of the ATF's Baltimore Field Division Group VII Evidence Vault. This phone had previously been in the custody of BPD.[2]

2.  As detailed further below, the **TARGET CELLULAR DEVICES** were seized pursuant to a Baltimore City District Court of Maryland search warrant[3] executed on April 16, 2025 for the residence of 1512 Presstman Street and for the persons of PERKINS[4] and ROBERTS as is further described in Attachment A.  I submit that there is probable cause to believe that the **TARGET CELLULAR DEVICES** contains evidence of drug trafficking to include violations of conspiracy to distribute and possess with intent to distribute controlled substances and distribution and possession with intent to distribute controlled substances in violation of sections 21 U.S.C. §§ 846 and 841 and possession of a firearm by a prohibited person in violation of Title 18 U.S.C. § 922(g)(collectively the "SUBJECT OFFENSES").

---

[2] The cellphone has been in law enforcement custody since ROBERTS arrest on April 16, 2025.  On April 29, 2025, Baltimore Police Department's homicide investigators executed a state search and seizure warrant on **TARGET CELLULAR DEVICE 2** in relation to a Baltimore City Homicide occurring on February 15, 2025, later described in this affidavit—however the state warrant is limited in scope. Federal investigators aim to obtain a full extraction of the device in support of this affidavit. Federal investigators did not possess the phone or obtain custody until August 5, 2025.  To my knowledge, no one has requested that it be returned.

[3] On April 14, 2025 by the Honorable Judge Latina Burse Greene, Baltimore City District Judge for the District Court of Maryland and permitted the search of the 1512 Presstman St. residence and the person of Perkins and Roberts.

[4] PERKINS is the owner of 1512 Presstman Street, Baltimore, Maryland.

## II.    **AFFIANT EXPERTISE**

3.      I am a Special Agent with ATF. As such I am a "federal law enforcement officer"
within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent
engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a
search warrant. I have been employed with the ATF since June of 2018. Since then, I have been
assigned to work federal investigations of violent criminal nature. Before joining ATF, I received
a bachelor's degree in Homeland Security and Terrorism from Virginia Commonwealth University
and worked for two years as a Uniformed Division Police Officer with the United States Secret
Service, assigned to assist in the protection of former United States Vice President Michael Pence
and former Second Lady Karen Pence.

4.      I have participated in numerous investigations concerning the illegal possession of
firearms, controlled substance laws, and the commission of violent crimes. I received specialized
training and personally participated in various types of investigative activities, including, but not
limited to: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and
other individuals who have knowledge of firearms and controlled substance laws; (c) code words
and phrases used by criminals when referencing firearms and narcotics; (d) undercover operations;
(e) the execution of search warrants; (f) the consensual monitoring and recording of conversations;
and (g) the handling and maintenance of evidence. I have participated in many arrests of
individuals who were in possessions of controlled substances and firearms.

5.      Through my training and experience, I have become familiar with the methods and
techniques associated with the distribution of various narcotics, including cocaine, cocaine base
(also "crack" or "crack cocaine"), heroin, fentanyl (and other opioids), methamphetamine,
phencyclidine ("PCP"), marijuana, ketamine, and other drugs. Through my training and

experience, I have also gained familiarity with the organization and operation of drug conspiracies, including their methods of manufacturing, concealing, transporting, and distributing various narcotics, including the above-noted substances, as well as their laundering of proceeds related to these illicit activities. I am also familiar with the support and assistance that narcotics organizations require to conduct their illegal activities.

6.    Based on my training, knowledge, and participation in narcotic and firearms investigations, I also have learned that:

a.    Drug traffickers use cell phones to further every aspect of the drug trade to include using them to contact—by way of both voice call and electronic message—drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs.

b.    Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, and the instruments of the drug trade (including firearms).

c.    Drug traffickers often maintain contraband, and instrumentalities related to the activity at secured locations, such as cell phones, firearms and other weapons, ammunition, scales, razors, packaging materials, cutting agents, cooking utensils, blenders, filtration masks, and containers for preparing and storing controlled substances for distribution. Drug traffickers often maintain multiple cell phones, firearms, and other instrumentalities of drug trafficking in secured locations.

d.    Drug traffickers often take photographs of themselves, their associates, their property, and illegal contraband. Such photographs are usually maintained in one or more secured locations, including on cell phones or computers found within such locations.

e.    Drug traffickers often use firearms to protect their drug trafficking business and frequently use cellular devices to document their possession of firearms.  For instance, people who illegally possess firearms commonly message and take photographs and videos of themselves holding firearms. Furthermore, people who illegally possess firearms commonly message or communicate with others to facilitate the sale to possess the firearm, as they are unable to acquire firearms through legal means as a felon.

f.    Drug traffickers often use their cellphones to arrange meetings with suppliers and coconspirators, travel to stash houses, transport drugs and drug proceeds, conduct counter-surveillance, and maintain instrumentalities of drug trafficking (including firearms, ammunition, and digital scales).

7.    I also know that drug traffickers use cell phones in furtherance of drug trafficking, and that the location data associated with those cell phones normally constitutes evidence and leads to evidence of drug trafficking. In particular, I have learned that:

a.    The location information associated with the cellular device assists law enforcement in identifying the drug trafficker's residence, identity, suspected drug buyers, coconspirators and associates, sources of supply, stash houses, meeting locations, and any financial institutions where drug traffickers are laundering their drug proceeds.

b.    Drug traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. Drug traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine ("PCP"), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, drug traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I have become familiar with the methods, language, and terms that narcotics traffickers use to disguise conversations about their drug trafficking activities.

c.    Drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to impede law enforcement efforts. Drug traffickers also communicate by using text messaging to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Since drug dealing is an ongoing process, drug traffickers require the use and protection of a communications network to facilitate their daily narcotics distribution.

8.    Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included every detail or every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based on my personal knowledge, my review of documents and other evidence, and my conversations with other

law enforcement officers and other people. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

9.    Based on the facts set forth in the affidavit, there is probable cause to believe that the users of the **TARGET CELLULAR DEVICES** are involved in the SUBJECT OFFENSES.

## III.    PROBABLE CAUSE

### A.    BRIEF OVERVIEW

10.    In 2025, the Baltimore Police Department ("BPD") initiated an investigation into Pennsylvania Avenue and North Avenue area of Baltimore, located in the Western District of Baltimore. In March of 2025, BPD initiated an investigation into PERKINS[5], a known drug distributor in the Western District of Baltimore City, and his associate ROBERTS[6] III.

### B. SURVEILLANCE CONDUCTED ON 1512 PRESSTMAN ST.

11.    On March 20, 2025, at approx. 4:00 p.m., BPD investigators witnessed PERKINS parking his dark colored 2019 Volvo (MD tag 6EZ1393) into the 1500 block of Presstman St. and approach 1512 Presstman St, Baltimore MD, 21217 (hereinafter referred to as "RESIDENCE"). As PERKINS approached the front door of 1512 Presstman St, an unknown black male (UNK1) met PERKINS in the entry way and handed PERKINS money while shaking his hand. PERKINS proceeded into the dwelling. While PERKINS was inside the location, UNK1 walked northbound on Presstman St. while a separate unknown black male (UNK2) walked to towards the RESIDENCE while on his cellphone. UNK1 and UNK2 waited on the sidewalk near the

---

[5] A query of PERKINS criminal history through the National Crime Information Center (NCIC) revealed that he is a convicted felon and thus prohibited from possessing firearms or ammunition. PERKINS' felony convictions include: two convictions in 2007 and 2008 for CDS Possession With Intent to Distribute.  PERKINS year of birth is 1988.

[6] ROBERTS year of birth is 2005 and per the Motor Vehicle Administration (MVA) has 1512 Presstman Street as his listed residence.  He has no criminal convictions.

RESIDENCE for several minutes until PERKINS exited and handed both UNK1 and UNK2 small objects resembling CDS commonly sold in the area. Based on these observed interactions, investigators believe that the suspected buyers (UNK1 and UNK2) were contacting PERKINS using their cellphones to purchase suspected CDS.

12.    On April 13, 2025, BPD investigators witnessed separate transactions using a CCTV camera. At approximately 5:17 p.m., an unknown male (UNK3) handed suspected money to someone in the doorway of the RESIDENCE. A few seconds later, ROBERTS walked into the RESIDENCE. Two minutes later, ROBERTS exited the RESIDENCE and handed a small object resembling CDS commonly sold in the area to UNK3. At approximately 5:20 p.m., as PERKINS approached the front of the RESIDENCE on foot, ROBERTS handed PERKINS an unknown amount of money. PERKINS returned inside the RESIDENCE. At approximately 5:39 pm, ROBERTS is seen with his cellphone in hand on the porch of RESIDENCE. Shortly after, a white Honda approaches and ROBERTS meets the Honda on the passenger side to receive a handful of cash through the window.

13.    At 5:53 pm, ROBERTS received additional money from another unknown male (UNK4). ROBERTS immediately entered the RESIDENCE with the money. A few minutes later, PERKINS exited the RESIDENCE with a clenched fist and exchanged an unknown object with UNK4. Later that evening, PERKINS re-entered the RESIDENCE and exited with his cellphone in hand to give an unknown female a small object similar to the size and shape of CDS sold in the area. Based on the investigation and knowledge of this area, which is known to be a high drug trafficking area, investigators believed that PERKINS and ROBERTS were facilitating multiple drug transactions in and around the RESIDENCE. Investigators observed PERKINS throughout the day on April 13th with a cellphone either in his hand or sticking out of his pocket, and

investigators believe PERKINS and ROBERTS use their cellphones to arrange drug transactions with their customers to arrive at the RESIDENCE when one of them are physically present. Based on your Affiant's training and experience, I know that it is common for drug traffickers to communicate with their drug customers and their associates to coordinate drug transactions.

### C. PERKINS AND ROBERTS ARREST – APRIL 16, 2025

14.    On April 15th and 16th, investigators conducted pre-raid surveillance. On April 16 at 3:49 pm, PERKINS was observed parking his black Acura, Maryland Tag A114867, in the 1500 block of Presstman St against the north sidewalk facing westbound. He then exited his car and walked into the RESIDENCE. PERKINS then exited his house at 3:54 pm and walked back to his vehicle where he was stopped and removed from his vehicle. Pursuant to the authorized state search warrant noted above, PERKINS was searched and a BPD officer recovered approximately 4 grams cocaine (confirmed cocaine – gross weight 3.478), a clear bag with 15 grams suspected marijuana and $22,905.72, believed to be drug proceeds.[7] **TARGET CELLULAR DEVICE 1** was recovered in the vehicle in the area PERKINS was sitting. Also in the vehicle were PERKINS two young children. BPD officers contacted the children's mother who arrived at the location and took the children.

15.    Simultaneously to PERKINS' arrest, BPD officers executed the search warrant signed by Judge Green on the RESIDENCE. Upon entry into RESIDENCE, BPD officers arrested Keith JACKSON (YOB: 1966) and Dominic RICHARDSON (YOB: 2006) who tried to flee. In the crowd of onlooker's officers identified and located ROBERTS. He was also arrested with a cellular device **(TARGET CELLULAR DEVICE 2)** on his person.

---

[7] A wage and earnings inquiry through the Department of Labor has PERKINS listed as a claimant of unemployment benefits.

16.    During the search of the RESIDENCE, law enforcement seized approximately 69 grams of rock cocaine ("crack cocaine") and approximately 4.973 grams of cocaine and fentanyl mixture. The analysis confirmed that the following drugs were present: tramadol, cocaine, 4-ANPP (4-Anilino-N-phenethylpiperidine), 6-MAM (6-Monoacetylmorphine), acetyl fentanyl, morphine, fentanyl). Officers also recovered a bag containing approximately 83.685 grams of cocaine and a clear bag with suspected cocaine weight 172 grams and another bag with approximately 105 grams that did not contain CDS and approximately 9,483 grams of suspected marijuana.

17.    Also located in the residence, investigators recovered four (4) digital scales with white residue, one (1) razor blade with white residue, measuring cups, spoons, a vacuum sealer (commonly used to seal bags of freshly manufactured CDS), as well as packaging materials and two kilo presses. Based on my training and experience, I believe the bulk amounts of controlled substances, and drug paraphernalia instruments and supplies found by investigators are in the dwelling are indicative of the residence being used as a "stash house", for the purposes of manufacturing and distributing of large quantities of CDS.

18.    In addition to the drug and drug paraphernalia recovered from the house, investigators also recovered a large quantity of ammunition throughout the house as well as four firearms from the front living room of the RESIDENCE, hidden within couch cushions include the following:

- *Glock 23 .40 S&W firearm (S/N# LXY964), with a switch attached – rapid-fire trigger activator, loaded with 21 rounds in an extended magazine.*

- *Mossberg MC2c 9mm Luger firearm (S/N# 013617MC) loaded with 14 rounds.*

- *Polymer80 9mm semi-auto handgun*

- *Charter arms undercover revolver (S/N# 762189) loaded with 5 rounds.*

19.     Additionally, law enforcement recovered 148 live rounds of ammunition and a high-capacity drum-style magazine. Based on my training and experience, individuals engaged in drug distribution often also possess firearms to engage in violent acts as well as use for their protection from rival drug traffickers.

### D. NIBIN RELATED HOMICIDES

20.     All four guns recovered from the scene were subsequently entered into the National Integrated Ballistics Information Network ("NIBIN"). NIBIN creates "leads" based on ballistic similarities between expended shell casings that have likely been fired from the same firearm. Investigators received a "Lead Notification" from NIBIN that indicated that the recovered .40 caliber Glock 23 bearing serial number LXY964 found during the search of 1512 Presstman was previously fired during the commission of two homicides and one non-fatal shooting in the first quarter of 2025.

21.     Specifically, investigators learned that that the first incident NIBIN indicated is ballistically connected to the Glock 23 was a homicide occurring on January 9, 2025. At about approximately 3:02 p.m. BPD officers located victim R.B suffering from multiple gunshot wounds in the 5900 block of Daywalk Ave. R.B. later died from his injuries.  Officers recovered eight .40 caliber shell casings at the scene.

22.     Further investigation revealed the second incident NIBIN indicated is ballistically connected to the aforementioned Glock 23 was a homicide occurring on February 15, 2025, where BPD officers responded to the 2100 block of Llewelyn Ave for a reported shooting. On scene, officers met an individual who claimed he and his friend, victim K.B were sitting in a vehicle getting food near the 1800 block of N. Montford Ave when suddenly they were shot at while inside

the vehicle. K.B. later died from his injuries. Fifteen .40 caliber shell casings were recovered from the scene.

23.     A third incident that NIBIN ballistically connected to the Glock 23 was an attempted homicide occurring on March 19, 2025 in the 400 block of Wilson St, located less than one mile from RESIDENCE. On scene, officers located victim E.F. who indicated that he was shot in the leg by unknown assailants while walking in the street.

24.     Based on my participation in violent crime investigations, I know that suspects who possess and have access to firearms used during NIBIN-related shootings often store them in dwellings they can access for repeated use or safekeeping. I know NIBIN-linked shootings that occur within months of each other typically involve the same suspect(s). Further, individuals who commit acts of violence in a series with firearms often have photographs on their cellphones of themselves with the firearms associated with the shootings they conducted.

25.     ATF and BPD are currently investigating the possession/distribution of CDS, homicides and non-fatal shootings referenced above. As noted above, based on my training and experience, drug traffickers engaged in drug distribution often also possess firearms to conduct violence and use for protection and take photographs of their firearm(s) as well as discuss their illegal activities on their cell phones. I believe, based on the investigation, that the **TARGET CELLULAR DEVICES** contain evidence of the SUBJECT OFFENSES.

## IV.    BACKGROUND CONCERNING ELECTRONIC COMMUNICATIONS DEVICE

26.     I am familiar with the mode of operation of individuals who commit drug trafficking offenses, including, but not limited to, their use of electronic devices to plan and coordinate drug trafficking activities. Based on my knowledge, training, and experience, individuals committing drug trafficking offenses frequently use cellular telephones,

communication devices, and other electronic media storage to further their illegal activities. Based upon my training, experience and participation in this and other investigations, I know the following:

27.    The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity. All of the above cell phones have both digital storage capacity and digital camera capabilities.

28.    Individuals engaged in drug trafficking offenses often use cell phones to communicate with suppliers, to place orders with suppliers, to communicate with customers, to receive orders from customers, and to arrange meeting times and locations for the distribution of CDS. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

29.    Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity.

30.    Cellular telephones are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following

the arrest of a member of their Drug Trafficking Organization ("DTO"), or at random in order to frustrate law enforcement efforts.

31.    Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

32.    Drug traffickers utilize different types of communication devices and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular telephone to communicate with customers and utilizing another cellular telephone to communicate with a source of supply of drugs.

33.    Cellular phones associated with drug traffickers include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

34.    The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone used during the investigation.

V.    **FORENSIC ANALYSIS OF ELECTRONIC COMMUNICATIONS DEVICES**

35.    Based on my knowledge, training, and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the

device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things that were once stored on the **TARGET CELLULAR DEVICES** may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

36.    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET CELLULAR DEVICES** were used, the purpose of their use, who used these phones, and when.

37.    There is probable cause to believe that this forensic electronic evidence might be on the **TARGET CELLULAR DEVICES** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

38.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

14

39.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

40.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

41.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

43.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET CELLULAR DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET CELLULAR DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

44.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

45.    During this case, investigators have learned that the drug-trafficking organization rely heavily on electronic devices to facilitate drug trafficking. It is necessary to conduct a physical inspection of the electronic devices in order to obtain electronic communications and other information that might be stored on the seized phones.

46.    The **TARGET CELLULAR DEVICES** remains in custody of law enforcement. The known specifics of the **TARGET CELLULAR DEVICES** are detailed in Attachment A and the types of information expected to be recovered from the **TARGET CELLULAR DEVICES** are listed in Attachment B.

## VI.    CONCLUSION

47.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the **TARGET CELLULAR DEVICES** will contain evidence of violation of federal law, to include conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841 and possession of a firearm by a prohibited person, in violation of 18 U.S.C. 922(g). The **TARGET CELLULAR DEVICES** may contain the records of the most recent calls, which may include calls with persons involved in the SUBJECT OFFENSES. The **TARGET CELLULAR DEVICES** may contain copies of SMS or text or other electronic communications relating to activities associated with the SUBJECT OFFENSES. The **TARGET CELLULAR DEVICES** may also contain a variety of other electronic evidence,

16

including electronic communications through various cellular or internet-based applications, photographs, and other information.

48.    Wherefore, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the **TARGET CELLULAR DEVICES** described in Attachment A and authorize the search for the information set forth in Attachment B, where applicable, which constitute fruits, evidence, and instrumentalities of the SUBJECT OFFENSES.

49.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

Jazmine R. Wright, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d) this _26th_ of September of 2025.

Hon. Chelsea Jones Crawford
United States Magistrate Judge

17

**ATTACHMENT A**
**Items to Be Searched**

The following items, referred to as the "**TARGET CELLULAR DEVICES**" are to be searched:

| TARGET CELLULAR DEVICE | BELIEVED USER | IDENTIFYING INFO | LOCATION |
|---|---|---|---|
| 1 | Rico PERKINS | An iPhone 15 Pro Max recovered from Rico PERKINS on April 16, 2025 | The **TARGET CELLULAR DEVICE 1** is currently in the custody of Baltimore Police Department's Digital Forensic Unit. |
| 2 | Duane ROBERTS | A damaged black iPhone 14 – Model A2649 recovered from Duane ROBERTS on April 16, 2025 | The **TARGET CELLULAR DEVICE 2 is** currently in the custody of the ATF's Baltimore Field Division |

**ATTACHMENT B**
**Search Protocols**

All records contained in the **TARGET CELLULAR DEVICES** described in Attachment A which constitute evidence of violations of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §922(g)(1), including but not limited to that outlined below:

1.  Contact logs that refer or relate to the users of any and all numbers on the **TARGET CELLULAR DEVICES**.

2.  Call logs reflecting date and time of received calls.

3.  Any and all digital images and videos of persons associated with this investigation.

4.  Messages to and from the **TARGET CELLULAR DEVICES** that refer or relate to the crimes under investigation.

5.  Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation.

6.  Search and browser history related to the crimes under investigation.

7.  Voicemails that refer or relate to the crimes under investigation.

8.  Voice recordings that refer or relate to the crimes under investigation.

9.  Any data reflecting the location of the **TARGET CELLULAR DEVICES**.

10.  Contact lists.

11.  Any and all records related to the location of the user(s) of the **TARGET CELLULAR DEVICES**.

12.  For each of the **TARGET CELLULAR DEVICES**:

a.  Evidence of who used, owned, or controlled the **TARGET CELLULAR DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the **TARGET CELLULAR DEVICES**, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

  c.  evidence of the lack of such malicious software;

  d.  evidence of the attachment to the **TARGET CELLULAR DEVICES** of other storage devices or similar containers for electronic evidence;

  e.  evidence of counter forensic programs (and associated data) that are designed to eliminate data from the **TARGET CELLULAR DEVICES**;

  f.  evidence of the times the **TARGET CELLULAR DEVICES** were used;

  g.  passwords, encryption keys, and other access devices that may be necessary to access the **TARGET CELLULAR DEVICES**;

  h.  documentation and manuals that may be necessary to access the **TARGET CELLULAR DEVICES** or to conduct a forensic examination of the **TARGET CELLULAR DEVICES**;

  i.  contextual information necessary to understand the evidence described in this attachment.

  13.  With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

  a.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

  b.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

  c.  "scanning" storage areas to discover and possible recover recently deleted files;

  d.  "scanning" storage areas for deliberately hidden files; or

e.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

14.    If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

15.    With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.